## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

ALEM MELES,                 )
                                        )
       **Plaintiff,**             )
                                          )
**v.**                                    )       **Case No. 3:14-cv-1487**
                                        )       **Judge Aleta A. Trauger**
**AVALON HEALTH CARE, LLC, d/b/a**    )
**Trevecca Health Care,**            )
                                        )
       **Defendant.**             )

## MEMORANDUM

Pending before the court are two motions filed by the defendant Avalon Health Care, LLC, d/b/a Trevecca Health Care ("Trevecca"): 1) a Motion to Dismiss (Docket No. 18), to which the plaintiff, Alem Meles, has filed a Response in opposition (Docket No. 25), and Trevecca has filed a Reply (Docket No. 27); and 2) a Motion for Summary Judgment (Docket No. 14), to which Ms. Meles has filed a Response in opposition (Docket No. 22), and Trevecca has filed a Reply (Docket No. 28)). For the foregoing reasons, the Motion to Dismiss will be denied and the Motion for Summary Judgment will be granted in part and denied in part.

## UNDISPUTED FACTS[1]

Trevecca is a nursing home and rehabilitation center. Stephanie Harris has served as Human Resources Director at Trevecca since 1997.[2]

---

[1] The facts recounted in this section are drawn primarily from Ms. Meles' Response to Trevecca's Statement of Undisputed Material Facts (Docket No. 23). This section also contains facts from Ms. Meles' June 22, 2015 Declaration (Docket No. 24) and Trevecca Human Resources Director Stephanie Harris' June 1, 2015 Declaration (Docket No. 16), and the documents attached thereto, that are not expressly refuted or contradicted by the opposing party.

[2] In the record, Ms. Harris is sometimes referred to by her former name, Stephanie Bryant.

Ms. Meles was born in Ethopia and is currently a resident of Nashville, Tennessee. She was employed by Trevecca as a laundry room bailor beginning in 2009. Her job duties consisted of washing and drying clothes, sheets, and other items for patients, as well as other laundry-related tasks. Her schedule consisted of three night shifts per week. She typically worked Tuesdays, Thursdays, and Fridays from 5:45 p.m. until 6:15 a.m. Her immediate supervisor was Virginia Diaz.

Ms. Meles was subject to Trevecca's policies and procedures, including those regarding attendance, non-discrimination and anti-harassment, and requests for leave under the Family and Medical Leave Act ("FMLA"). These policies were contained in an employee handbook provided to Ms. Meles at the start of her employment.

Trevecca's anti-harassment policy states, in part: "If an employee feels he or she is being harassed, that employee should immediately report the matter to his or her Department head or Administrator." Upon receiving a complaint of harassment, Trevecca's policy is to promptly investigate the complaint and, if necessary, remedy the offensive conduct. (Docket No. 23 at ¶ 2.)[3]

Ms. Meles requested paid sick leave from March 28-30, 2012, per company policy. Ms. Meles used this time to undergo a procedure to terminate a pregnancy. She did not directly inform Trevecca or her co-workers about the nature of her procedure.

_____

[3] In her Response to Trevecca's Statement of Undisputed Material Facts, Ms. Meles indicates that Trevecca's policy to immediately investigate complaints is in dispute. (Docket No. 23 at ¶ 2.) Ms. Meles does not cite to anything in the record, nor can the court locate any evidence in the record that calls this policy into dispute. The court, therefore, accepts this fact as true for purposes of summary judgment.

On March 29, 2012, Ms. Meles had a note faxed to Trevecca from her medical provider, a physician at Planned Parenthood. This fax was illegible and Ms. Harris informed Ms. Meles that she needed to provide a new note. Ms. Meles subsequently provided a legible copy of the first note, along with an additional note from the same physician. Both notes indicated that Ms. Meles should be excused from work for the three days from March 28 through March 30, 2012 but contained no details about the nature of Ms. Meles' procedure. Trevecca approved Ms. Meles' paid absence for this period. [4]

---

[4] Ms. Meles avers, in her Declaration, that Ms. Diaz and Ms. Harris repeatedly insisted that she provide additional details about the nature of her procedure in order for them to approve her paid absence. (Docket No. 24 at pp. 1-3.) Ms. Harris asserts, in her Declaration, that the reason additional documentation was requested is because the initial fax from Ms. Meles' physician was illegible. (Docket No. 16 at 2-3.) A copy of the illegible fax is found in the record at Docket No. 16, Ex. B and, in fact, no information whatsoever (even Ms. Meles' name or her physician's name) is visible. While Ms. Harris does not expressly deny Ms. Meles' allegation that she and Ms. Diaz asked Ms. Meles for additional details about her procedure, the court construes Ms. Harris' explanation for the additional document request as a denial that anything else was said about the matter. Moreover, Ms. Meles does not anywhere contest that, once a legible copy of her physician's note was provided, she was granted paid sick leave as requested, despite the fact that no details about the nature of her procedure were provided nor did she reveal any.

Ms. Meles also avers, in her Declaration, that Ms. Diaz subsequently informed Ms. Meles' coworkers about Ms. Meles' abortion. (Docket No. 24 at p. 4). This allegation is also contained, although in a somewhat cryptic form, in the August 15, 2012 written complaint Ms. Meles lodged with Trevecca. (Docket No 16, Ex. 5.) There is no evidence in the record to support this allegation other than Ms. Meles' own statements, which she admits are based on assumption. (Docket No. 28, Ex. 1. at pp. 5-7.) Ms. Meles conceded, in her deposition, that she never heard Ms. Diaz make any comments about her pregnancy and that her allegations are based only on the fact that Ms. Meles' coworkers made comments about Ms. Meles' abortion and Ms. Meles cannot explain how they knew about it. *Id*. Ms. Meles further concedes, in her declaration, that she never told anyone at Trevecca, including Ms. Diaz, about her abortion. (Docket No. 24 at ¶¶ 10, 14.)

In her Response to Trevecca's Statement of Undisputed Material Facts, as recounted below, Ms. Meles concedes that neither Ms. Harris, nor Ms. Diaz, nor any other Trevecca supervisor or

In June of 2012, Ms. Meles complained verbally to Ms. Diaz and then in writing regarding her coworker, Janice Coure. There is no evidence in the record regarding the details of what Ms. Meles said to Ms. Diaz at this time, but Ms. Meles' written complaint from June 28, 2012 states that Janice Coure was laughing at Ms. Meles for no reason, would not communicate with her, and was uncooperative in performing their work assignments.

On August 15, 2012, Ms. Meles filed another written complaint against two coworkers, Alesia Barton and Janice Coure. This complaint alleged that, on August 14, 2012, these coworkers cursed at Ms. Meles, threw socks at her, and threatened to hurt her. The complaint also stated that, on this same day, they called Ms. Meles "ugly" and "monkey," commented about her taking time off of work for an abortion, and stated that they couldn't understand her and didn't know what language she was speaking. Ms. Meles also told Ms. Diaz that these coworkers were making taunting comments to her about her belly being fat and about her having "another abortion."

---

manager, ever made any inappropriate or offensive comments to Ms. Meles about her race, sex, or national origin. (Docket No. 23 at 7.) Ms. Meles also concedes in her briefing on summary judgment: "It is true that Meles was harassed by coworkers and not supervisors or managers," and she does not appear to base any of her claims on the allegations against Ms. Diaz and Ms. Harris recounted in this footnote. (Docket No. 22 at p. 8.) The allegations that Ms. Diaz and Ms. Harris improperly asked Ms. Meles for private medical information and shared private medical information about Ms. Meles with her coworkers, therefore, not only lack credibility or support in the record, but they are also irrelevant to any of the claims at issue. The court notes these allegations only because they occupy a large portion of Ms. Meles' Declaration and briefing on summary judgment and, therefore, appear – even if untrue – to be a primary source of Ms. Meles' agitation, perhaps due to some sort of misunderstanding that took place at the time (it appears from the record that there is a language barrier, as Ms. Meles appears to have relied on the assistance of an interpreter at her deposition). Accordingly, the court notes that these allegations have not been ignored but have been reviewed, in the context of the record and the briefing, and found to have no proper place in the court's analysis.

On August 16, 2012, Ms. Meles took a day off. On the day she returned to work, her coworkers made fun of her for having a "fat belly" and made comments about her having "decided to keep the baby." Ms. Meles reported this incident to Ms. Diaz, who told her that someone from Human Resources would address the matter, but no one came that day.

At some point between March and August of 2012, Ms. Meles also complained to Ms. Diaz that her coworker, Dien Harleston, engaged in inappropriate conduct, including making sexually suggestive remarks, and that she felt uncomfortable around him. The record, however, does not provide any additional details about what Mr. Harleston said or did or when. There is no evidence in the record that Ms. Meles filed any written complaints about Mr. Harleston, nor are there any further details in the record regarding what Ms. Meles told Ms. Diaz about him.[5]

Ms. Barton, Ms. Coure, and Mr. Harleston[6] were all coworkers of Ms. Meles, with no authority to hire, fire, discipline, or take any action on behalf of Trevecca that could affect Ms.

_____

[5] Similarly, Ms. Meles testified, during her deposition, that Ms. Coure, Ms. Barton, and Mr. Harleston made "racial comments" every day from March to August of 2012, and that she submitted complaints about it "many times." (Docket No. 21, Ex. 1 at p. 22-26.) She also added that Mr. Harleston told her "go back" and "you need a husband from America." *Id*. Ms. Meles also admitted, however, that it has been a long time and she does not remember how often the harassment occurred. *Id*. The record does not contain any additional details about the alleged daily "racial comments" or any additional context for the alleged comments by Mr. Harleston. Accordingly, for purposes of summary judgment, the court finds these allegations are not properly developed in the record and will not be considered.

[6] In Ms. Meles' written complaints to Trevecca, as well as in her pleadings, briefings, Declaration, and deposition testimony, Ms. Meles uses inconsistent names (and spellings) for these coworkers. Ms. Meles does not appear to dispute, however, that their proper names are Janice Coure, Alesia Barton, and Dien Harleston. Trevecca refers to them by these names, and it appears from the record that Trevecca uncovered the proper identities of these individuals in the course of its internal investigation into Ms. Meles' complaints and through its familiarity with the names and positions of its employees.

Meles' employment.  Ms. Barton and Ms. Coure are African-American women, and Mr. Harleston is an African-American man.

Neither Ms. Harris, Ms. Diaz, nor any other Trevecca supervisor or manager, ever made any inappropriate or offensive comments to Ms. Meles about her race, sex, or national origin, and Ms. Meles never made any complaints against a supervisor or manager.

In August 2012, Trevecca launched an investigation into Ms. Meles' complaints about her coworkers that included interviews with the named coworkers and eyewitnesses, as well as a review of Trevecca's security camera recordings.  Trevecca was unable to substantiate or corroborate Ms. Meles' allegations.[7]  On August 22, 2012, this fact was communicated to Ms. Meles by Ms. Diaz and another Trevecca manager, Bobby Sharpe.

---

[7] In her Response to Trevecca's Statement of Undisputed Material Facts, Ms. Meles responds to Trevecca's assertion that an investigation was conducted by stating that this fact is in dispute because "it is unclear what is meant by the launching of an investigation or that any such investigation was conducted."  (Docket No. 23 at p. 2-3.)  Ms. Meles cites no evidence to refute Trevecca's assertion that it conducted an investigation.  Trevecca's statement properly cites to, and is supported by, Ms. Harris' Declaration (Docket No. 16) and exhibits thereto.  Moreover, Ms. Meles responds to Trevecca's assertion that the investigation did not substantiate or corroborate Ms. Meles' allegations by stating that these statements "are undisputed for the purpose of this motion for summary judgment insofar as Trevecca questioned the employees and accepted their denial of any harassment as fact."  (Docket No. 23 at p. 3.)  This is a clear admission by Ms. Meles that an investigation was conducted and included, at least, the employee interviews, in direct contradiction to her prior assertion that it is unclear that any investigation was conducted.  To the extent Ms. Meles argues that either Trevecca did not conduct the investigation it claims to have conducted or that this investigation was insufficient and reached an inaccurate conclusion, she cites no evidence, nor is there any such evidence in the record.  Ms. Meles, therefore, fails to meet the criteria set forth in Rule 56(c)(a) of the Federal Rules of Civil Procedure.  Accordingly, the court accepts as true Trevecca's position, as recounted above, that it conducted an investigation and could not corroborate Ms. Meles' allegations against her coworkers.  The sufficiency of this investigation will not be called into question for purpose of the court's summary judgment analysis.

On August 24, 2012, after the investigation was concluded, Ms. Meles complained again to Ms. Diaz that the harassment by her coworkers was still going on and requested a change of jobs within the company or a different schedule. There is no evidence in the record regarding the details of Ms. Meles' complaints to Ms. Diaz at that time.[8] Ms. Diaz told Ms. Meles she was just causing trouble and should do her job; she also told her that her earlier complaints had done no good but that she could make another written complaint if she wanted.

Trevecca scheduled a meeting for August 27, 2012 for Ms. Meles and her coworkers to discuss the ongoing issue, but Ms. Meles did not attend the meeting and was absent from work that day.[9]

Ms. Meles faxed a physician's note to Trevecca excusing her from work for August 27 through September 3, 2012, with a return to work date of September 4, 2012.

Ms. Meles did not return to work on September 4, 2012 and, in fact, she never returned to work at Trevecca thereafter.

## DISPUTES OF FACT AS TO MS. MELES' TERMINATION DATE[10]

---

[8] Ms. Meles' Declaration states that, on August 23, 2012, her coworkers called her "doggie" and "dumb, fat monkey," told her they could not understand her when she spoke, told her she was "so dumb [she] hadn't even finished the 12th grade, and stated that she should stop complaining because they would stick together and deny her complaints and have her fired. (Docket No. 24 at ¶ 18.) Ms. Meles' Declaration does not indicate, however, that any of these specifics were reported to Ms. Diaz or to anyone else at Trevecca.

[9] There is a dispute of fact as to whether Ms. Meles was expected at the meeting but did not show up or was told by Ms. Harris, or one of the other supervisors, that she was not needed at the meeting.

[10] This section highlights the conflicting versions of events from September 4, 2012 onward, as set forth in Ms. Meles' June 22, 2015 Declaration (Docket No. 24) and Ms. Harris' June 1, 2015 Declaration (Docket No. 16).

Ms. Meles avers that, on September 4, 2012, she called and spoke to Bobby Sharpe, another Trevecca manager, and told him that she was still sick and that he responded that she could take time off until she was "fully recovered."

Trevecca avers, to the contrary, that Ms. Meles never called in on September 4, 2012 but was a "no-call/no-show" that day under Trevecca's attendance policy. Trevecca further avers that it was not until September 12, 2012 that Ms. Meles explained that her absence on September 4th had been due to her ongoing medical condition.[11] Trevecca does not allege, however, that any adverse employment action was taken against Ms. Meles due to this absence but, rather, concedes that her time off during this period was retroactively approved.

Ms. Meles avers that she returned to her doctor on September 6, 2012, and received a letter stating that she should remain out of work for an additional three weeks. According to Ms. Meles, she faxed that note to Ms. Diaz and then called Ms. Diaz on that same day, September 6, 2012, to confirm that Ms. Diaz had received the note. In this conversation, Ms. Meles avers that Ms. Diaz told her she was terminated from her position at Trevecca.

It is undisputed that Ms. Meles subsequently filed a complaint with the EEOC, sometime between September 6, 2012 and September 12, 2012, though the exact date of that filing is not clear from the record.[12]

---

[11] Curiously, Trevecca does not allege that Ms. Meles was a no-call/no-show for any other days between September 4th and September 12th, despite the undisputed fact that Ms. Meles did not come to work at all during that time period and Trevecca's allegation that no explanation was given until the 12th.

[12] This fact is not directly stated in Trevecca's Statement of Undisputed Facts or Ms. Meles' Response thereto, nor is it referenced at all in the Harris Declaration. Ms. Meles' Declaration indicates that the EEOC complaint was filed after the September 6, 2012 conversation with Ms. Diaz and prior to Trevecca's providing Ms. Meles with any documents regarding FMLA leave.

It is also undisputed that, on September 12, 2012, Ms. Harris (aware by this point in time of Ms. Meles' ongoing medical condition and need for further time off) sent Ms. Meles an FMLA certification form to be completed by Ms. Meles' physician and returned to Trevecca. This form indicated that Ms. Meles had informed Trevecca on September 12, 2012 that she needed FMLA leave for the period beginning September 6, 2012. It is further undisputed that Ms. Meles brought this form to her physician, and her physician completed it and faxed it back to Trevecca on Setptember 18, 2012. Ms. Meles' physician indicated that Ms. Meles had been suffering from her condition from August 24, 2012 and was expected to need to remain out of work until October 15, 2012.

It is undisputed that, on September 20, 2012, Ms. Harris, upon receipt of the completed form, mailed Ms. Meles a letter informing her that she had been approved for an eight-week FMLA leave with a return to work date of October 16, 2012.[13] This form indicated that Ms. Meles was required to present a fitness-for-duty certification to Trevecca before she could be restored to her position.[14]

---

Trevecca does not refute this timing, and it is accepted as true for purposes of summary judgment. An undated document that appears to be an attachment to the EEOC complaint is found in the record as an exhibit to the Meles Deposition, attached to Trevecca's Memorandum in support of its Motion For Summary Judgment. (Docket No. 21, Ex 1 at p. 30.) This document recounts Ms. Meles' version of the September 6, 2012 conversation between Ms. Meles and Ms. Diaz in which Ms. Diaz informed Ms. Meles that she was terminated from her position, but states that the conversation took place on September *5*, 2012. *Id.* It is not clear, however, that this document has been authenticated and would be admissible at trial.

[13] Assuming Friday, August 24, 2012 was Ms. Meles' last day of work (or even her first day absent), the court notes that a return date of October 16, 2012 is a few days shy of a full eight weeks of leave. This curiosity, however, is not material to the analysis.

[14] In her Response to Trevecca's Statement of Undisputed Facts, Ms. Meles responds to Trevecca's assertion that she was approved to take FMLA leave until October 16, 2012, and that

Finally, it is undisputed that Ms. Meles never attempted to return to work at Trevecca or to submit a fitness-for-duty certification. In fact, the record is devoid of any communication between Ms. Meles and Trevecca after the September 20, 2012 mailing of the FMLA approval letter.[15]

While Trevecca never directly refutes the alleged September 6, 2012 conversation between Ms. Meles and Ms. Diaz in which Ms. Meles avers she was terminated from her position, Trevecca asserts, to the contrary, that Ms. Meles was not in fact terminated on September 6, 2012 but, instead, remained a Trevecca employee until she was officially terminated in November 2013.[16] Trevecca avers that the reason for Ms. Meles' termination at

_____

a copy of this letter was mailed to her, by stating that "the timing and manner in which the approval took place and was communicated to the Plaintiff are disputed." (Docket No. 23 at ¶ 16.) Ms. Meles does not dispute, however, that Trevecca sent her notice that she needed to present a fitness-for-duty certificate in order to return to work, notice which appears from the record to have been contained in the same letter that contained the notice of FMLA leave approval. (Id. at ¶ 17.) The court interprets Ms. Meles' responses to indicate, not that Ms. Meles contests her receipt of the FMLA approval form but, rather, that she contests that she reasonably understood the approval of FMLA leave to mean that she remained a Trevecca employee eligible to return to work on October 16, 2012, in light of the prior conversation with Ms. Diaz in which she was told she was terminated from her position. It is not entirely clear from the record whether Trevecca offered any pay or other benefits to employees who were out on FMLA leave, or whether Ms. Meles received any pay or benefits during this period. Both the FMLA eligibility letter that Ms. Harris sent to Ms. Meles on September 12, 2012, and the FMLA approval letter she sent on September 20, 2012 indicate that Ms. Meles may have been eligible to use paid sick, vacation, or other leave during this time period. (*See* Docket No. 16, Exs. 9, 11.)

[15] In her Response in opposition to Trevecca's Motion for Summary Judgment, Ms. Meles states: "In a letter, dated November 8, 2012, Trevecca indicates that Meles was no longer employed after August 2012." (Docket No. 22 at p. 5.) There is, however, no such document in the record, nor any reference to such a document in any of the Declarations or testimony in the record.

[16] In her Response to Trevecca's Statement of Undisputed Statement of Material Facts, Ms. Meles does not properly cite to evidentiary support in the record for her refutation of Trevecca's assertion that Ms. Meles was not terminated until November 14, 2013. (Docket No. 23 at ¶ 19.)

that time was her failure to return to work or provide a fitness-for-duty certification upon the expiration of her approved FMLA leave.  Trevecca does not explain why it waited over a year to terminate Ms. Meles.  The record contains no evidence that the alleged November 13, 2014 termination was ever communicated to Ms. Meles.

## PROCEDURAL HISTORY

On July 7, 2014, Ms. Meles filed an action against Trevecca in the Circuit Court for Davidson County, Tennessee, bringing claims for 1) violation of her rights under the Family and Medical Leave Act ("FMLA") (29 U.S.C. § 2611, *et seq.*, 2) hostile work environment and discrimination based on race, sex, and national origin in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et seq.*), and 3) discrimination in violation of the Tennessee Human Rights Act ("THRA") (TENN. CODE ANN. § 4-21-101, *et seq.*).  (Docket No. 1, Ex. A (the "Complaint").)

On July 22, 2014, the action was removed to the Middle District of Tennessee on the basis of federal question jurisdiction, pursuant to 28 U.S.C. § 1441(a).  (Docket No. 1.)

On September 15, 2014, the court issued an Initial Case Management Order ("the CMO"), requiring – among other things – that the parties exchange initial disclosures under Federal Rule of Civil Procedure 26(a)(1) by September 24, 2014, that all written discovery and fact witness depositions be completed by April 30, 2015, and that dispositive motions be filed by June 1, 2015.  (Docket No.10.)

---

The court finds, however, that it is not necessary to search the record for such evidence.  Ms. Meles' Declaration explicitly clarifies the evidentiary basis for Ms. Meles' position: her allegation that she was terminated in September of 2012.  (Docket No 24 at ¶ 23.)

Ms. Meles has never provided Trevecca with initial disclosures, despite several requests by Trevecca and an agreement by Ms. Meles' counsel, on the record at Ms. Meles' May 11, 2015, deposition,[17] that he would provide the disclosures by May 15, 2015.

On June 1, 2015, Trevecca filed a Motion to Dismiss for Failure to Provide Rule 26 Initial Disclosures (Docket No. 18), along with a Memorandum in Support (Docket No. 19) and a Declaration of Chen G. Ni (counsel for Trevecca) with attached exhibits (Docket No. 20).

Also on June 1, 2015, Trevecca filed a Motion for Summary Judgment (Docket No. 14), as well as a Memorandum in support with attached exhibits (Docket Nos. 15 and 21), a Declaration of Stephanie Harris with attached exhibits (Docket No. 16), and a Statement of Undisputed Material Facts (Docket No. 17).

On June 22, 2015, Ms. Meles filed a Response in opposition to Trevecca's Motion to Dismiss (Docket No. 25), along with a Declaration of her counsel, Michael L. Freeman (Docket No. 26).

Also on June 22, 2015, Ms. Meles filed a Response in opposition to Trevecca's Motion for Summary Judgment (Docket No. 22), along with a Response to Trevecca's Statement of Undisputed Material Facts (Docket No. 23) ,and a supporting Declaration (Docket No. 24).

On July 2, 2015, Trevecca filed a Reply in further support of its Motion to Dismiss (Docket No. 27) as well as a Reply in further support of its Motion for Summary Judgment (Docket No. 28).

## **MOTION TO DISMISS**

---

[17] Trevecca explains in its Reply to its Motion to Dismiss that Ms. Meles' deposition was originally scheduled for April 8, 2015, but that Ms. Meles and her counsel appeared almost three hours late and the parties then agreed to reschedule the deposition for May 11, 2015, even though this was outside of the deadline for fact witness depositions.  (Docket No. 27 at p.3, n.3.)

Trevecca moves, under Federal Rule of Civil Procedure 41(b), to dismiss this action due to Ms. Meles' failure to provide Trevecca with Initial Disclosures as required by Rule 26(a)(1) and the court's September 15, 2014 CMO.

## I.  <u>Rule 41 and Rule 37</u>

Rule 41(b) allows a defendant to move for involuntary dismissal of an action where a plaintiff has failed to comply with the federal rules or with a court order.  Trevecca argues that Ms. Meles' failure to provide initial disclosures is grounds for dismissal of the case, with prejudice, under Rule 37(c)(1), which allows the court to impose any sanctions, including dismissal, listed under Rule 37(b)(2)(A) for failure to comply with Rule 26 procedures.[18]

Under Federal Rule of Civil Procedure 37(c), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial . . .", and the court "may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)."[19]  In responding to violations of Rule 26, the trial court is granted a great deal of discretion in determining the scope sanctions under Rule 37(c).  *See., e.g., Taylor v.*

---

[18] Trevecca also cites Rule 16(f)(1), which states that a party that fails to obey *any* scheduling order may be subject to "just orders," including those authorized by Rule 37(b)(2)(A).  There is no need to analyze the issue separately under Rule 16, as the question of sanctions under 37(b)(2)(A) is subsumed under the court's Rule 37(c)(1) analysis.

[19] Rule 37(b)(2)(A)(i)-(vi) lists the following sanctions: "(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims; (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters into evidence; (iii) striking pleadings in whole or in part; (iv) staying further proceedings until the order is obeyed; (v) dismissing the action or proceeding in whole or in part; (vi) rendering a default judgment against the disobedient party."

*Medtronics, Inc.*, 861 F.2d 980, 985 (6th Cir. 1988). While Rule 37 generally requires the exclusion of evidence not properly disclosed, even this sanction may be avoided, at the court's discretion, where there is a reasonable explanation or where the mistake was harmless. *See Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transport*, 596 F.3d 357, 370 (6th Cir. 2010) (*citing Vance ex rel. Hammons v. United States*, 182 F.3d 920 (6th Cir. 1999)).

The imposition of additional sanctions is likewise discretionary and, in determining whether to grant dismissal for disclosure violations, the court should consider: 1) evidence of bad faith, 2) prejudice to the opposing party, 3) whether the violating party had notice of the potential sanction, and 4) whether less drastic sanctions have been considered. *See Bessemer*, 596 F.3d at 370 (*citing Phillips v. Cohen*, 400 F.3d 388, 402 (6th Cir. 2005)); S*tamtec, Inc. v. Anson*, 195 F. App'x 473, 479 (6th Cir. 2006). Moreover, the Sixth Circuit has referred to the dismissal of an action for violation of discovery procedures as a "sanction of last resort." S*tamtec,* 195 F. App'x at 478; *see also Schreiber v. Moe*, 320 F. App'x 312, 317-18 (6th Cir. 2008) ("While we have recognized that district courts possess broad discretion to sanction parties for failing to comply with procedural requirements, we have also cautioned that dismissal for failure to prosecute is a harsh sanction which the court should only order in extreme situations . . . dismissal is appropriate only if the attorney's dilatory actions amounted to failure to prosecute and no alternative sanction would protect the integrity of the trial proceedings.") (internal citations omitted).

II.  <u>Application</u>

Ms. Meles has plainly violated Rule 26 and the CMO by failing to provide Trevecca with initial disclosures, despite numerous reminders by Trevecca and Ms. Meles' counsel's own promise to Trevecca that he would comply. It appears to the court, however, that this violation

14

does not reflect any bad faith intent by Ms. Meles to withhold from Trevecca information about the evidence she plans to rely on to support her claim. To the contrary, the failure to provide initial disclosures reflects Ms. Meles' sheer lack of evidence to disclose in support of her claim, as evidenced by the dearth of evidence relied on in her Response to Trevecca's Motion for Summary Judgment, discussed in greater detail below. Indeed, in her Response to Trevecca's Motion to Dismiss, Ms. Meles does not attempt to argue that she should still be permitted to introduce any significant amount of previously undisclosed evidence at trial but, rather, states simply that she, "herself, will be the primary witness at trial." (Docket No. 25 at p.1.) Ms. Meles' Response does not identify any other documents or witnesses she intends to use, with the exception of one potential witness, her cousin Solomon Aregawi.[20] *See id.*

In keeping with Rule 37, the court holds that Ms. Meles will not be permitted at trial to introduce any other evidence aside from her own testimony during her case in chief (including testimony from Mr. Aregawi). The court does not, however, find that dismissal of the action is warranted. Further, Ms. Meles' own testimony will not be excluded because the court finds that Ms. Meles' failure to disclose her own testimony under Rule 26 is plainly harmless. Not only was Trevecca necessarily aware that Ms. Meles' recounting of her version of events would be at issue in this trial, but Trevecca has had the opportunity to fully depose Ms. Meles prior to the

---

[20] Ms. Meles references Mr. Aregawi in her Declaration as someone who can corroborate her allegations regarding Ms. Diaz and Ms. Harris' response to her physician's note in March of 2012. (Docket No. 24 at ¶¶ 5-9.) As discussed above, these allegations are nevertheless irrelevant to this action, and so it is not clear that Mr. Aregawi's testimony would in any event be admissible at trial, let alone significant. *See infra*, n. 4. Ms. Meles also alleges, in her Opposition to Trevecca's Motion to Dismiss, that Mr. Aregawi was identified to Trevecca at Ms. Meles' own deposition, which he attended. (Docket No. 25 at p.1.) This allegation, however, is not properly supported by any facts in the record and does not affect the court's finding that, due to the failure to properly disclose Mr. Aregawi, Ms. Meles may not call Mr. Aregawi at trial.

deadline for the filing of dispositive motions.  Accordingly, nothing presented at trial will come as a surprise to Trevecca, nor does the court find that Ms. Meles' failure to provide initial disclosures otherwise prejudices Trevecca's preparation of its defense.  If anything, Ms. Meles' counsel's failure to provide disclosures reflects an overall lack of zealous advocacy on behalf of Ms. Meles and an implicit admission that the evidence Ms. Meles has garnered to support her case is thin.  It is, therefore, Ms. Meles – and not Trevecca – who may have a difficult time proving her case before a jury on this record.  Trevecca's preparation of its defense in this matter, on the other hand, is exceedingly straightforward, as Trevecca needs only to prepare to respond to Ms. Meles' own recounting of the events after already having taken Ms. Meles' deposition and received her Declaration.

Trevecca relies primarily on *Knight v. Systech Int'l, LLC* (2013 WL 6827930 (M.D. Tenn. Dec. 20, 2013)) in arguing that dismissal is appropriate here.  The circumstances in Knight, however, differ significantly from the circumstances here.  In *Knight*, the court found that, in addition to failing to serve disclosures, the plaintiff had willfully failed to attend multiple hearings, failed to obey court orders to pay attorney's fees, failed to respond to motions, and had been warned by the court that continued failure to comply could result in dismissal, demonstrating a total unwillingness to prosecute the case.  2013 WL 6827930 at *4.  In this case, to the contrary, Ms. Meles has participated in the litigation, aside from the failure to provide initial disclosures, and there is no other evidence of an unwillingness to prosecute the action or of bad faith.  There have been no warnings to counsel prior to the filing of Trevecca's Motion to Dimiss and no indications by the court that this action was at risk of dismissal.  Allowing Ms. Meles to proceed, while not allowing her to introduce evidence beyond her own testimony,

represents a less drastic measure than dismissal of the action that is fair to both parties and will ensure that Trevecca is not prejudiced in defending this matter.

For these reasons, the court will deny Trevecca's Motion to Dismiss. The court will, however, order that Ms. Meles may only introduce her own testimony, and no other evidence, during her presentation of her case in chief at trial.

## MOTION FOR SUMMARY JUDGMENT

Trevecca's position on summary judgment is grounded in the operating presumption that the undisputed facts show that Ms. Meles was terminated from her position no earlier than November of 2013. Trevecca does not address whether Ms. Meles' claims could survive as a matter of law, were a factfinder to accept Ms. Meles' allegation that she was terminated by telephone conversation with Ms. Diaz in September of 2012.[21] The court's review of this motion, therefore, turns, in part, on the court's interpretation as to whether the record creates an actual dispute of fact with respect to the date of Ms. Meles' termination. At face value, Ms.

---

[21] Trevecca argues that Ms. Meles may not assert that she was terminated in September of 2012 because this is inconsistent with statements she made in her deposition testimony. (Docket No. 3 at p. 3, n. 4.) Specifically, Trevecca cites Ms. Meles' deposition testimony that she could not recall the specific date of the conversation with Ms. Diaz and that she never received termination paperwork at that time. The court finds, however, that this is not inconsistent. In her deposition testimony, Ms. Meles did not disavow her allegations regarding the conversation with Ms. Diaz in September 2012. To the contrary, there is no deposition testimony, or other evidence, in the record that contradicts the statement that Ms. Diaz told Ms. Meles she was terminated, by phone, in September 2012. While Ms. Meles did state that, at the time of the deposition, she could not recall the specific month and date, she maintained that her termination had taken place in 2012. (Docket No. 28, Ex. 1 at p. 8-10). It is for a jury to determine whether the deposition testimony that she could not recall the date, as well as the lack of termination paperwork from September 2012, cuts against Ms. Meles' credibility in stating that she was told, and rationally believed, she was terminated at that time. The testimony does not, however, preclude the court from allowing Ms. Meles the opportunity to tell her side of the story as laid out in her Declaration.

Meles' Response to Trevecca's Statement of Undisputed Facts does not reflect any true dispute, as Ms. Meles cites to no facts in the record as required under Rule 56. As discussed above, however, Ms. Meles' Declaration, which is attached to her Response in opposition to Trevecca's Motion for Summary Judgment, tells a very different story. The court does not need to search for the factual allegations that refute Trevecca's basic premise for its summary judgment motion, that Ms. Meles was not terminated from her position until November of 2013. While the question of whether Ms. Meles was terminated on September 6, 2012 will ultimately be a question for the jury, for purposes of summary judgment, the court views the disputed facts in the light most favorable to Ms. Meles. Accordingly, the court analyzes each of Ms. Meles' claims under the presumption that she was in fact terminated from her position by telephone conversation with Ms. Diaz on September 6, 2012, a fact which may further color the meaning of the FMLA leave approval documentation she received after that point in time.

## I.      Standard of Review

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Conversely, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of her

claims. "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## II.     Title VII Discrimination Claim

In order for Ms. Meles to succeed on a Title VII discrimination claim, she would need to prove that her termination in September of 2012 was based on her race, sex, or national origin. *See* 42 U.S.C. § 2000e-2(a)(1). The Sixth Circuit has held that there are two types of Title VII discrimination cases: single-motive cases, in which an employer's decision is based solely on discriminatory motive and mixed-motive cases, in which an employer's decision is based on both discriminatory and non-discriminatory factors. *White v. Baxter Healthcare, Corp.*, 533 F.3d 381, 396 (6th Cir. 2008). Under a single-motive theory, absent direct evidence of discriminatory motive, a plaintiff must show the following in order to establish a prima facie case of discrimination (according to the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)): 1) that she is a member of a protected class, 2) that she was qualified for her job, 3) that she suffered an adverse employment decision, and 4) that she was replaced by a person outside the protected class or treated differently than similarly

situated non-protected employees. *See, e.g.*, *id*. at 391; *Fullen v. City of Columbus*, 514 F. App'x 601, 605 (6th Cir. 2013) (citing *Newman v. Fed. Ex. Corp*., 266 F.3d 401, 406 (6th Cir. 2001)). Under a mixed-motive theory, a plaintiff's burden is lower, but, in order to survive summary judgment, she is still required to produce "evidence sufficient to convince a jury that . . . race, color, religion, sex, or national origin was a motivating factor for the defendant's adverse employment action." *White*, 533 F.3d at at 400 (internal citations omitted).

For the reasons discussed above, Trevecca's arguments on summary judgment, which presume that Ms. Meles was not terminated from her position until November 2013, are misplaced. Ms. Meles may be able to survive summary judgment based on the evidence she has put forth that she was terminated in September 2012 and, for purposes of this analysis, the court construes the alleged September 2012 termination to be the adverse employment decision at issue. It is also undisputed that Ms. Meles is a member of several protected classes based on her race, sex, and national origin. However, Ms. Meles still must demonstrate the other elements of her claims. It is plain that the record in this case is devoid of any evidence that Trevecca based Ms. Meles' termination, even in part, on discriminatory motive and, therefore, Ms. Meles cannot establish even a prima facie case of Title VII discrimination.

Ms. Meles concedes that no supervisor or manager ever made any comments about her race, sex, or national origin. There is no evidence in the record to suggest that Trevecca, or any of its managers or supervisors, held biased views against Ms. Meles, expressed biased behavior, or otherwise considered her race, sex, or national origin in making the determination to terminate her. To the contrary, the record shows that Ms. Meles was employed by Trevecca for several years without incident, including having been treated leniently with respect to past attendance violations that could have resulted in termination. Prior to her termination, nothing changed with

respect to Ms. Meles' status as a member of protected classes or Trevecca's awareness of her protected class status.  Further, Ms. Meles has placed no evidence in the record regarding the treatment of similarly situated employees outside of the protected classes she occupies.  For these reasons, the court finds that Ms. Meles' Title VII discrimination claims cannot proceed as a matter of law, and summary judgment will be granted to Trevecca on this claim.[22]

## III.    Title VII Hostile Work Environment Claim

To establish a *prima facie* claim of hostile work environment based on the actions of coworkers, a plaintiff must demonstrate evidence of the following: 1) she is a member of a protected class, 2) she was subject to unwelcome harassment, 3) the harassment was based on her status as a member of a protected class, 4) the harassment was sufficiently pervasive to affect a term, condition, or privilege of employment, and 5) the employer knew or should have known about the harassment but failed to take preventative or correction action.  *See, e.g., Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008); *Bailey v. USF Holland, Inc.*, 526 F.3d

---

[22] The court notes that the record might support an inference (due to temporal proximity and the alleged comments of Ms. Diaz) that Ms. Meles' termination in September 2012 was motivated, at least in part, by the complaints of discrimination she made against her coworkers and, therefore, support a retaliation claim under Title VII.  Ms. Meles, however, failed to name this claim in her Complaint (Docket No. 1, Ex. 1) and there is no indication in the CMO that Ms. Meles presented a retaliation theory as a basis for this action at the time of the initial case management conference (see Docket No. 10 at p.1).  Moreover, Ms. Meles has not articulated an argument that she has a Title VII retaliation claim in her Response to Trevecca's Motion for Summary Judgment.  After laying out the elements of a Title VII *discrimination* claim, and arguing that she has made a prima face case that she was fired for discriminatory reasons because she was replaced by a male employee (a fact not in the record), Ms. Meles adds that "something else Meles did was request that the management of Trevecca stop her coworkers from harassing her." (Docket No. 22 at p. 6.)  Ms. Meles does not, however, argue that these complaints were the basis for her termination.  Ultimately, the court will not read a retaliation claim into this action *sua sponte*.

880, 885 (6th Cir. 2008) (citing *Michael v. Caterpillar Fin. Serv. Corp.*, 496 F. 3d 584, 600 (6th Cir. 2007)).  Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted).  Determining whether an environment is hostile or abusive requires "looking at all the circumstances" and considering factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or, a mere offensive utterance; and whether it unreasonably interferes with an employees' work performance."  *Id.* at 23.

The only evidence in the record to support Ms. Meles' hostile work environment claim is three incidents in August 2012, in which Ms. Coure, Ms. Barton, and Mr. Harlseton allegedly threw socks at Ms. Meles, threatened to hurt her, called her "ugly," "dumb," "doggie" and "monkey," commented about her taking time off of work for an abortion and commented on her "fat belly," teased her about her education, and stated that they could not understand her and did not know what language she was speaking.[23]  While it is not entirely clear from the record that Ms. Meles can link any of the alleged comments to her race, sex, or national origin, the court finds that a jury may be able to infer that comments about Ms. Meles' physical appearance and abortion were related to her sex,[24] that the comments about her language and intelligence were

---

[23] An earlier incident in which Ms. Coure laughed at Ms. Meles and was uncooperative is not relevant to this analysis because there is no evidence in the record to suggest this incident can be construed as harassment based on Ms. Meles' race, sex, or national origin.

[24] Trevecca argues that abortion-related comments generally cannot be construed to create a hostile work environment on the basis of sex, but it cites only to one district court case that held that an isolated comment about an abortion did not constitute severe and pervasive harassment (*Taverna v. First Wave, Inc.*, 2010 WL 4930593 (N.D. Okla. Nov. 30, 2010)) and a Supreme

related to her national origin, or that calling Ms. Meles "monkey" was a derogatory term related to her race.  Ms. Meles, thus, may be able to prove the first three elements of a hostile work environment claim: that she is a member of protected classes, that she experienced unwanted harassment, and that this harassment was related to her status as a protected class member.

Viewing the allegations of harassment as a whole, however, the court finds that Ms. Meles has not presented sufficient evidence of the fourth factor, that the harassment she allegedly experienced was severe or pervasive enough to demonstrate a hostile work environment as a matter of law.  *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000) (finding no hostile work environment as a matter of law where there were only four incidents of sex-based harassment, including three incidents that involved physical touching); *Burnett v. Tyco Corp.*, 203 F.3d 980, 985 (6th Cir. 2000) (finding no hostile work environment based on two incidents of sexually suggestive comments, which the court found "merely offensive" and one instance of reaching inside the plaintiff's blouse).  It is clear that the Sixth Circuit has established a very high bar for a finding of pervasive harassment to support a hostile work environment claim.  *See Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562-53 (6th Cir. 1999) (finding a hostile work environment could be established by evidence of several  instances of crude language and inappropriate touching, several instances of physically intimidating behavior such as locking the plaintiff inside, blocking exits, blocking her workspace, throwing boxes, and gluing items to her desk, along with ongoing offensive language and comments as well as differential treatment by both coworkers and a supervisor, while noting that each

Court case that addressed the question of whether protests of abortion constitute discrimination against women (*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993)).  (Docket No. 21 at 18.)  The court does not find, as a matter of law, that taunts by coworkers about Ms. Meles being pregnant and/or having an abortion cannot be construed as harassment based on her sex.

category of offense alone might not). The evidence Ms. Meles has put forth of what is essentially name-calling and taunts in only two recorded instances, and one instance of throwing socks, cannot meet this high threshold.

Moreover, the court finds that Ms. Meles has not shown any evidence to support the fifth factor of her hostile work environment claim – that Trevecca was notified of the harassment and did nothing about it. It is undisputed that Trevecca followed up on the written complaints it received by conducting a full investigation and finding that the allegations were not substantiated and that there were, therefore, no additional actions to be taken. Ms. Meles cites no evidence to support the position that Trevecca failed to conduct an adequate investigation or that there were other actions Trevecca should have taken but did not. It is further undisputed that Trevecca called a meeting for August 27, 2012 to discuss the issue with Ms. Meles' coworkers, despite the harassment not being corroborated. The fact that Ms. Meles was out of work that day and did not attend this meeting, and what happened between Ms. Meles and Trevecca after that point in time, is irrelevant to the finding that there is no evidence to refute that, at least initially, Trevecca properly and sufficiently addressed Ms. Meles' complaints.

Ms. Meles' allegation that she was thereafter fired on September 12, 2012, does not demonstrate a hostile work environment. Ms. Meles cannot rely on the fact that she asked Ms. Diaz for a change of shift or a new position after the investigation was concluded and that this particular remedy was denied. She does not provide any evidence that this remedy was warranted because she does not sufficiently refute that Trevecca's official investigation showed no harassment. Nor does Ms. Meles cite to any evidence in the record to suggest that the remedies she sought were in any way a part of Trevecca's policy for handling even substantiated claims of harassment. A hostile work environment claim cannot be sustained on the basis that

the employee did not get the exact remedy he or she sought. Moreover, Ms. Meles cannot rely

on the allegation that, on August 24, 2012, Ms. Diaz told her to get back to work and that her

prior complaints had done no good. At most, this conversation suggests that Ms. Diaz was

displeased with complaints of harassment that were unsubstantiated by investigation, but it does

not suggest that harassment was condoned or ignored. Moreover, Ms. Meles concedes that Ms.

Diaz also informed her that she was welcome to make another written report if she wished.

Accordingly, the court finds that Ms. Meles' hostile work environment claim cannot

proceed and will grant summary judgment to Trevecca on this claim.

## IV.    THRA Claims

The THRA is a Tennessee statute that tracks Title VII and is analyzed in the same way.

*See Regnier v. Metro. Gov. of Nashville*, 2006 W.L. 1328937 (Tenn. Ct. App. May 11, 2006) ("It

is clearly the law in Tennessee that federal case law on Title VII and related civil rights statutes

may be used to interpret the THRA since the stated purpose and intent of the THRA is to execute

the policies embodied within the federal anti-discrimination acts) (citing TENN. CODE ANN. § 4-

21-101)(a)(1)); *Bobo v. United Parcel Service, Inc.*, 665 F.3d 741, 757-58 (6th Cir. 2012). Ms.

Meles' claims under the THRA, which she does not articulate separately from her Title VII

claims in her briefing on summary judgment, are, therefore, analyzed as duplicative of her Title

VII discrimination and hostile work environment claims discussed above. Accordingly, Ms.

Meles' claims under the THRA will be dismissed for the same reasons her Title VII claims were

dismissed.

Ms. Meles' THRA claims are additionally barred by the THRA's one year statute of

limitations. *See* TENN CODE ANN. § 4-21-311(d); *see also Baltimore v. City of Franklin*, 2007

WL 2123906 (M.D. Tenn. July 20, 2007). Ms. Meles' discrimination claim, which is premised

on a termination date of September 6, 2012, and her hostile work environment claim, which is based on alleged harassment that took place between March and August of 2012, were not filed until nearly two years later in July of 2014. For these reasons, the court will grant summary judgment to Trevecca on the THRA claims.

## V.     FMLA Claims

Ms. Meles does not fully articulate her position on summary judgment with respect to her FMLA claims. She neither clarifies which FMLA claims she asserts, nor does she explain how the facts in the record support the elements of these claims. Her Response in opposition to Trevecca's Motion for Summary Judgment contains only the following statement: "Trevecca violated FMLA by denying Alem Meles leave until Trevecca learned that Meles had filed a charge of discrimination with the EEOC. Meles was terminated by Trevecca on September 4, 2012, a fact that was communicated to her on September 6, 2012. She filed a claim with the EEOC on September 12, 2012 and when she communicated this fact to Trevecca, the pretext of granting the FMLA leave was hatched." (Docket No. 22 at p. 5.) Nevertheless, the court finds that the meaning of Ms. Meles' position is clear: she argues that, because she was terminated on September 6, 2012, Trevecca cannot defend against her FMLA claims based on FMLA approval documentation that was processed after that time, when she believed – irrespective of what those documents indicated – that she was not welcome to return to work. Trevecca's briefing on this issue does not address this ground for Ms. Meles' claim but, instead, argues that there can be no FMLA claim because FMLA leave was clearly granted, and Ms. Meles was not terminated until a year after that leave expired. Therefore, the court finds that it would be inappropriate to dismiss Ms. Meles' FMLA claims on the basis of her inadequate briefing and, instead, turns to the underlying question of whether the facts in the record, when viewed in the light most

favorable to Ms. Meles, can support the elements of an FMLA claim. For the reasons discussed more fully below, the court finds that they can.

### A. Legal Standard for FMLA Claims

There are two theories of recovery under the FMLA, interference and retaliation. *Wallner v. Hilliard*, 590 F. App'x 546, 550 (6th Cir. 2014) (citing *Hunter Valley View Local Sch.*, 579 F.3d 688, 691 (6th Cir. 2009)). The elements of an FMLA interference claim are simple: 1) the employee was entitled to benefits, 2) the employee notified the employer of the intent to exercise the rights, and 3) the employee was denied the benefits to which she was entitled. *Id.* (citing *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507-08 (6th Cir. 2006)). There is no need to show evidence of any particular employer motive or intent. *Id.* A retaliation claim requires showing a causal connection between an exercise of FMLA rights and an adverse employment action. *Id.* (citing *Edgar*, 443 F.3d at 408 and *Hunter*, 579 F.3d at 692). "[F]iring someone who has just requested FMLA leave before he can take it could be construed both as retaliation for having asked for leave and as interference with the employee's ability to take it." *Id.* at 551 (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 283 F.3d 818, 825 (6th Cir. 2002)). Finally, temporal proximity between exercising FMLA rights and an adverse employment action can lead to an inference of causality. *Id.* at 554 (finding that an employee discharge nine days after returning from FMLA leave led to a strong inference of causal connection.)

### B. Application

While the undisputed facts show that Ms. Meles was sent notification approving an FMLA leave from August 24, 2012 through October 15, 2012, Ms. Meles has also presented evidence that she was effectively terminated from her position on September 6, 2012, during a conversation with Ms. Diaz about her request for ongoing leave. Trevecca's argument in favor

of summary judgment does not address the sufficiency of these facts to support an FMLA claim. If true, the conversation between Ms. Meles and Ms. Diaz on September 6, 2012 could give rise to both a finding that Trevecca interfered with Ms. Meles' FMLA rights and an inference that Ms. Meles' termination was motivated by her request to exercise her rights under the FMLA in support of a retaliation claim. Ms. Meles' evidence to support these claims is admittedly thin and relies solely on the credibility of Ms. Meles' version of events in September 2012 and, with respect to the retaliation claim, an inference based on the temporal proximity of the request for leave and the termination. However, the burden for an FMLA interference claim is low, and, if a jury were to find Ms. Meles' version of her termination credible, she would easily meet all three elements of the claim.

It is undisputed that Ms. Meles was entitled to FMLA benefits. It is also undisputed that she requested leave. Terminating her employment at the time of this request (such that she was either unwelcome to any FMLA benefits at all or unwelcome to return to work after the leave period expired) is plainly a denial of her FMLA rights. With respect to the retaliation claim, the court acknowledges that the record is devoid of any evidence of motive beyond the temporal proximity. Yet, if Ms. Meles' version of events is true, her termination actually occurred in the same conversation in which she asked for leave, suggesting a very strong inference of causal connection. The court finds, viewing the facts in the light most favorable to Ms. Meles, that while Ms. Meles may have an uphill battle convincing a jury of the elements of either FMLA claim on the basis of this record, there is a genuine question of fact that warrants allowing Ms. Meles to proceed. Accordingly, Trevecca's motion for summary judgment will be denied as to Ms. Meles' FMLA claims.

**CONCLUSION**

For the reasons discussed herein, Trevecca's Motion to Dismiss will be denied and Trevecca's Motion for Summary Judgment will be granted with respect to Ms. Meles' THRA and Title VII discrimination and hostile work environment claims, but denied with respect to Ms. Meles' FMLA claims. Additionally, Ms. Meles will not be permitted to rely on any evidence in her case in chief aside from her own testimony.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge